Rose **PEDONE**, Executrix of the Estate of Sam Pedone, and Rose Pedone

v.

The **UNITED STATES**.

Charles **PEDONE** and Marian Pedone

v.

The **UNITED STATES**.

Nos. 39–55, 40–55.

United States Court of Claims.

May 8, 1957.

Richard Katcher, Cleveland, Ohio, for plaintiffs. Jerome N. Curtis and Herbert B. Levine, Cleveland, Ohio, were on the briefs.

Walter B. Langley, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland and Allen A. Bowden, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

These actions are for the recovery of income taxes alleged to have been improperly assessed for the year 1952 against plaintiffs Sam and Rose Pedone, jointly as husband and wife, and against plaintiffs Charles and Marian Pedone, jointly as husband and wife, in the amounts of $2,756.64 and $2,797.64, respectively, plus interest. Since the actions were instituted, plaintiff Sam Pedone has died and his wife, Rose

Pedone, has been substituted as executrix of his estate.

During the period in question, plaintiffs Sam and Charles Pedone, were equal partners in the Pedone Lathing & Plastering Company, whose business was primarily that of a plastering contractor. The operations of the business consisted of employing plasterers and laborers to apply rough and finish coats of plaster to the interior walls and ceilings of buildings. The materials necessary to do the jobs were also supplied by the partnership.

At all times herein pertinent, the above referred to employees were subject to the jurisdiction of the Economic Stabilization Agency and its Wage Stabilization Board, which were organized and operated pursuant to the Defense Production Act of 1950, 64 Stat. 798, 803–812, as amended, 50 U.S.C.A.Appendix, §§ 2061 et seq., 2101–2110. The pertinent provisions of title IV of that act are as follows:

"Sec. 401. * * * Whenever the authority granted by this title is exercised, all agencies of the Government dealing with the subject matter of this title, within the limits of their authority and jurisdiction, shall cooperate in carrying out these purposes.

* * * * * *

"Sec. 405. * * * (b) No employer shall pay, and no employee shall receive, any wage, salary, or other compensation in contravention of any regulation or order promulgated by the President under this title. *The President shall also prescribe the extent to which any wage, salary, or compensation payment made in contravention of any such regulation or order shall be disregarded by the executive departments and other governmental agencies in determining the costs or expenses of any employer for the purposes of any other law or regulation.*" (Emphasis supplied.)

Specific penalties for violation of the provisions of the act are provided for in section 409 thereof:

"Sec. 409. * * * (b) Any person who willfully violates any provision of section 405 of this title shall be guilty of a misdemeanor and shall, upon conviction thereof, be subject to a fine of not more than $10,000, or to imprisonment for not more than one year, or both. Whenever the President has reason to believe that any person is liable to punishment under this subsection, he may certify the facts to the Attorney General, who may, in his discretion, cause appropriate proceedings to be brought.

"(c) If any person selling any material or service violates a regulation or order prescribing a ceiling or ceilings, the person who buys such material or service for use or consumption other than in the course of trade or business may, within one year from the date of the occurrence of the violation, except as hereinafter provided, bring an action against the seller on account of the overcharge. In any action under this subsection, the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is greater: (1) such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, but in no event shall such amount exceed the amount of the overcharge, or the overcharges, plus $10,000, or (2) an amount not less than $25 nor more than $50 as the court in its discretion may determine: * * "

Sections 409(a) and 706 of the act also provide for the availability of injunctions, restraining or other orders of a temporary or permanent nature, whenever any person has engaged or is about to engage in any act violative

of section 405 or any other section of the act.

The Economic Stabilization Agency on April 3, 1952, issued its General Order No. 15, 17 Fed.Reg. 2994, effective April 5, 1952, dealing with policy and procedure with respect to disallowances for violation of title IV of the Defense Production Act, supra, and that order provides in part as follows:

"Sec. 4. *Disallowance policy*— (a) *Purposes of disallowance.* The disallowances under the authority granted by sections 2 and 3 may be made for one or more of the purposes of:

"(1) Calculating deductions or the basis for determining gain under the Revenue Laws of the United States;

"(2) Determining costs and expenses under any contract made by or on behalf of the United States, either directly or indirectly; * * "

From March 1, 1952, through September 12, 1952, the partnership paid wages in excess of the maximums established pursuant to the authority granted by section 405(b) of the Defense Production Act quoted above. The partnership's wage scales for journeyman plasterers ran from about $3.00 per hour to $3.50 per hour during the period when the approved area rate was only $2.97 per hour to $3.07 per hour. The partnership paid its laborers at rates varying from $2.125 per hour to $2.50 per hour when the approved area rate was $2.10 per hour to $2.35 per hour. The record shows that the plaintiffs cooperated with the Enforcement Division of the Wage Stabilization Board in cutting back to the legal area rate upon request to do so. The record also shows that it was the custom of the employer to pay premium rates since it began operations and that the employees had received raises proportionately since that date.

On or about November 25, 1952, the partners entered into a stipulation with the Wage Stabilization Board with respect to the excessive wage payments. That stipulation contained a provision that the parties agreed that the stipulation be transmitted to the National Enforcement Commission of the Economic Stabilization Agency for the issuance and transmittal of a Certificate of Disallowance to the appropriate executive departments or other agencies of the Government pursuant to section 405(b) of the Defense Production Act, supra, and section 4 of the Economic Stabilization Agency's General Order No. 15, supra. It also contained an agreement that the National Enforcement Commission could forthwith certify to the Commissioner of Internal Revenue that for the purpose of calculating deductions or the basis for determining gains of the employer under the revenue laws of the United States the sum of $13,535 should be disregarded for the employer's taxable year ending December 31, 1952, and that the deduction should be charged against the income of the partners, plaintiffs in these cases. On December 16, 1952, the National Enforcement Commission sent a Certificate of Disallowance to the Commissioner of Internal Revenue and advised him as hereinbefore noted.

In its partnership income return for 1952, the amount the partnership paid its employees for performing the work of plastering was included as part of the partnership's cost of goods sold and amounted to $257,720.72. This amount included the above $13,535.

The Commissioner of Internal Revenue, purportedly acting pursuant to the Defense Production Act, Economic Stabilization Agency General Order No. 15, and the Certificate of Disallowance, disallowed the inclusion of the $13,535 as part of the partnership's cost of goods sold and assessed a deficiency against the respective taxpayers in an amount that such an exclusion would reflect.

On or about November 4, 1953, plaintiffs filed a claim for refund in the amounts specified above as the sum sought to be refunded by this suit. Six months expired without any action by

the Commissioner, and the plaintiffs brought this suit.

The plaintiffs say that the Government, in refusing to subtract the wages actually, though illegally, paid, from the amounts received by the plaintiffs from their plastering contracts, is taxing them, not upon their income, but upon their gross receipts. They make an argument which is not easy to follow, that the services for which the wages were paid were the "goods sold" by them, and that, therefore, the wages were the costs of the goods sold and must be subtracted from the price received in order to determine the income or profit from the contracts. If it were material it should be pointed out that the plaintiffs were not selling services. They were selling finished jobs of plastering, not essentially different from finished books or storm doors. Materials and labor are necessary to produce any of these things, and the materials, improved and increased in value by the labor, are the things to which title passes.

But we think that these refinements of the law of title to property have nothing to do with our problem. There is no doubt that in the ordinary case the wages of the persons who work on the product sold are subtractable from the sale price, in determining taxable income. Whether that subtraction is made in this column or that column, or this schedule or that schedule, of the income tax form, does not, in the normal case, affect the amount of the tax. The rare case in which it does make a difference where the labor costs are placed in the income tax form is illustrated by Woodside Acres, Inc., 46 B. T. A. 1124; affirmed, 2 Cir., 134 F.2d 793. But the question of the order of computation on the tax form, a question of the interpretation and application of the taxing statutes, is not important in relation to the constitutional question of whether certain receipts may be sub-jected to a Federal income tax at all.

It was not the intent of the 16th Amendment to authorize the Federal Government to lay an income tax upon everything of value that came into the ownership of the potential taxpayer. The common understanding of the word income is the amount which one has gained by his transaction or activity. His gains, not his gross receipts, are his constitutionally taxable income. Our question is whether the line of constitutional taxability is so sharply drawn that Congress has not the power, in order to promote some public policy, to provide that certain costs, the incurring of which is in violation of law or public policy, shall be disregarded in computing gains, i. e., taxable income. If Congress may so provide, the "gain" which is taxed is, one must admit, a fictitious one. If interested parties promise to pay a legislative representative $50,000 to secure the enactment of certain legislation, and if the representative spends $25,000 to bribe legislators in order to obtain or better insure the enactment of the legislation, is it constitutional to tax as income the $50,000, or only the $25,000 which the representative has left after he had spent the other $25,000 for bribes? See Supreme Court discussion in Lilly v. Commissioner, 343 U.S. 90, 72 S.Ct. 497, 96 L.Ed. 769.

Since as early as the Revenue Act of 1918, in sections 214(a) (1) and 234(a) (1) [1] Congress has limited the amount which may be subtracted for income tax purposes, on account of salaries and labor, from the selling price of goods, to a "reasonable allowance" for salaries and wages. The Commissioner of Internal Revenue has, when necessary, reduced the amounts, particularly of executive salaries, to what he regarded as reasonable amounts in the circumstances. If the plaintiff's contention is correct, this provision in the successive statutes has been unconstitutional. We do

1. See 26 U.S.C. (1952 ed., Supp. II) 162(a) (1) for the corresponding provision in the Internal Revenue Code of 1954.

not think that such a constitutional infirmity has existed for all these decades without being discovered and exposed in litigation. Common opinion, and acquiescence by those affected by legislation over a long period is evidence of a community sense that its Government has not exceeded its lawful powers.

If the 16th Amendment gives the Government leeway to refuse to treat as a subtractable cost of goods sold a perfectly lawful wage or salary actually paid, because the Government rightfully concludes that it is unreasonably large, it would seem that, *a fortiori,* the Government could accord similar treatment to payments made in violation of law or public policy. If it could not do so, it would find itself in the position of subsidizing the violation of its law or public policy, since a percentage of the improper payment, depending on the tax bracket of the taxpayer, would be recovered by him in the form of a reduction of his income tax. In this type of cases, as in the cases of unreasonable wages and salaries, we understand that the practice of refusing to allow the subtraction of such expenditures is almost as old as the income tax law.

Upon this background of history and common opinion we are not willing to impose the revolutionary doctrine which the plaintiff urges upon us. Our conclusion is that the plaintiffs did not overpay their taxes, and their petitions must be dismissed.

It is so ordered.

JONES, Chief Judge, and WHITAKER, Judge, concur.

LARAMORE, Judge.

I respectfully dissent from the opinion of the majority in this case for what I think are some very cogent reasons.

Plaintiffs concede that they made wage payments in excess of maximums established pursuant to section 405(b), but argue that the value of the services rendered by the aforementioned employees are, because of their nature, elements of the cost of goods sold and, therefore, constitutionally exempt from taxation. They contend that to permit an income tax on these wages would be to tax capital, and since the 16th Amendment to the Constitution permits income taxation only on "income" the tax would be unconstitutional. Plaintiffs argue that the provision "income" in the 16th Amendment does not mean gross receipts and that the term, by its very nature, permits an exclusion from the gross receipts of the cost of the goods sold before arriving at the income taxable under the 16th Amendment. The cost of the goods sold, it is argued, is capital. The goods sold in plaintiffs' cases were services, they argue, thus, when the partnership is paid in money for the value of the services rendered, the payment represents merely a return of the capital expenditure for wages. Therefore, plaintiffs continue, to the extent that receipts embrace a repayment of the capital expenditure, that is, to the extent that the receipts are reimbursement for the cost of goods sold, they are constitutionally exempt from taxation, hence, the Commissioner of Internal Revenue cannot exclude the value of such services in determining the income subject to taxation, despite the Defense Production Act or General Order No. 15 of the Economic Stabilization Agency which were the basis of the Commissioner's actions in these cases. Taxpayers argue, however, that there is no authority in the act or the order to empower the Commissioner to disallow the wages in question as the act speaks only of "expenses" and the order of "deductions," both of which are words of art which have a carefully defined meaning under the Internal Revenue Code. Plaintiffs contend that the Defense Production Act and the order by the use of those terms provide only for the disallowance of the deduction of expenses which are normally deductible under section 23 of the Internal

Revenue Code,[1] but that Congress did not intend to disallow the offset against gross receipts for cost of goods sold as it was without the authority to do so, the cost of goods sold being a constitutionally exempt item.

Plaintiffs further argue that to the extent that the Defense Production Act permits the interpretation placed upon it by the Commissioner of Internal Revenue it is unconstitutional.

Defendant, on the other hand, feels that section 405(b) of the Defense Production Act, supra, authorizes the Commissioner of Internal Revenue to disregard any amount in arriving at taxable income upon receipt of a Certificate of Disallowance. In arguing that the Commissioner's actions in subtracting the subject amount in determining taxable income was correct despite the fact that the sum may properly have been an element of the plaintiffs' cost of goods sold, defendant says that the fallacy of taxpayers' argument is that Congress intended to control all wages paid by any employer covered by the act, not just wages which are not included as part of the cost of goods sold. Defendant argues also that the word "costs" in section 405(b) of the act indicates the congressional intent to cover all items including labor costs which are part of the cost of goods sold. Defendant asserts that a tax on the excluded amount would not constitute a tax on capital as plaintiff contends, because capital is broadly that which they, plaintiff, invested in their business as their contribution to the partnership and later net profits which had been allowed to accumulate.

Defendant further argues that to support plaintiffs' contentions would frustrate the intent of the act to regulate wages; however, in this respect plaintiffs point to other sections of the act which provide criminal and civil sanctions, the purposes of which are to enforce the act.

As to the word "costs" in section 405 (b) plaintiffs argue that it has reference to costs or expenses under any contract made by or on behalf of the United States or for the purpose of laws other than the revenue laws and that section 4(a) (2) of the Economic Stabilization Agency's General Order No. 15 supports this view.

Despite the argument of the defendant and the feeling of the majority of this court, I believe I should point out the fallacy of the argument that Congress intended to cover all wages even if part of the cost of goods sold; to wit, if, as plaintiffs contend, the subject amount of wages is constitutionally exempt from taxation, then it matters not that Congress, by the Defense Production Act, intended that overpayments of such wages should be excluded in determining taxable income because, in

---

1. Section 23 of the Internal Revenue Code of 1939, 26 U.S.C. § 23, follows:

"Sec. 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

"(a) Expenses.

"(1) Trade or business expenses.

"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. In the case of any sports program conducted for the benefit of the American National Red Cross, expenses described in section 22(b) (16) (B) shall be allowable under this subparagraph only to the extent that such expenses exceed the amount excluded from gross income by section 22(b) (16)."

Section 23 continues from subsection (b) through subsection (ff) (4) and relates to other items not covered in the above paragraph but which the code specifically denominates as deductible in arriving at taxable income under the code.

Section 24 deals with items specifically not deductible.

such a case, it would be without Congress' jurisdiction to do so. Congress certainly has the power to regulate wages of all kinds by any means available to it, but, if constitutional provisions exempt an item from taxation, the mere fact that the payment of that item represents the violation of a statute does not empower the Congress to levy a tax upon it. The Constitution is supreme and Congress cannot act except in accordance with it.

By the same reasoning, if plaintiffs' argument is correct, and defendant's is also correct to the extent that the word "costs" contained in section 405(b) was intended by the Congress to mean or refer to the cost of goods sold, then Congress' action by the use of the term in trying to regulate the cost of goods sold was improper and, hence, ineffectual and unconstitutional.

Thus, as I see it, the issues in this case are whether the cost of goods sold may be subject to income taxation in light of the 16th Amendment and, if not, are the wages in question paid by the plaintiffs to their employees charged with doing the plastering work truly an element of the cost of goods sold of the partnership. If the first question can be answered in the negative and the second in the affirmative, plaintiffs can recover, otherwise they must fail.

I am of the opinion that the cost of goods sold is constitutionally exempt from taxation and that the wages here in question are truly an element of the cost of goods sold.

The basis of the present income tax laws is the 16th Amendment to the Constitution which provides as follows:

"The Congress shall have power to lay and collect taxes on *incomes*, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." [Emphasis supplied.]

While, over the years, there has been some dispute as to whether the term "income" contained therein means "gross income" or "net income," the cases are quite settled on the point that it does not mean "gross receipts."

"* * * In order to determine whether there has been gain or loss, and the amount of the gain, if any, we must withdraw from the gross proceeds an amount sufficient to restore the capital value that existed at the commencement of the period under consideration." Doyle v. Mitchell Brothers Co., 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054.

On this subject Mertens, Law of Federal Income Taxation, volume 1, section 5.10, and the cases cited therein, are quite explanatory:

"The history of the income tax in this country from its crude beginning as a war-time measure in 1861 to the present day, shows a development of the idea that such a tax should be imposed upon *net* income. The Sixteenth Amendment does not, however, define income and does not specify whether the tax is to be imposed upon net income or gross income. Although under our present statutory scheme the tax is imposed essentially upon net incomes, the question whether such a tax may be imposed upon gross income is not academic; it arises in the allowance or disallowance of statutory deductions, and particularly in determining whether taxable income must allow for exhaustion of the asset producing the receipts, that is, whether such receipts include a return of capital.

"It is now generally agreed that the income tax is not limited to 'net income' but may under certain circumstances be imposed upon gross income. The courts have repeatedly viewed deductions as matters of legislative grace, so that 'net income' becomes a statutory rather than an economic concept under which items which might be considered as gross income by the busi-

ness man are treated as taxable income by statute.

"*To say that items of gross income may be taxed is not the same as to say' that under all circumstances the courts will countenance a tax on gross receipts. The terms 'gross income' and 'gross receipts' are not synonymous. 'Gross receipts' is a broader term, including within it receipts which may constitute capital as well as income, and, \* \* \* returns of capital may not be taxed.*" [Citations omitted and emphasis supplied.]

Section 5.06 of the cited volume states, at page 171, as follows:

"While there has been and still is considerable groping in determining when increment in capital has been realized so as to be taxable, *there is substantial agreement that amounts received as a return of capital or investment are not income within the general meaning of that term and may not be taxed under the Sixteenth Amendment.*" [Citations omitted and emphasis supplied.]

This view has also been expounded by Roswell Magill in his work Taxable Income, and cases therein cited, at page 359 wherein he states:

"This line of decisions, from Doyle v. Mitchell Bros. Co. down to date, indicates that the term 'income' does not mean total gross receipts from the sale of property. Although the decisions are expressly worded in terms of statutory construction, some of them actually go beyond that, since under the specific terms of the act considered in Goodrich v. Edwards, for example, there would have been a taxable profit, whereas the Court held that no gain or income was realized. This requirement that the capital investment must be returned before the proceeds become taxable as income results from the somewhat sharp distinction, at least in this regard, between income and capital. It

would seem clear to the ordinary person that only the gain over the original cost is income. The Court has adopted the same view. *Hence, the cost of goods sold must be allowed as a deduction from gross receipts in arriving at the income which is subject to tax under the amendment and the revenue laws.*" [Citations omitted and emphasis supplied.]

I am in agreement with the above quotations and feel quite emphatically that "gross receipts" cannot be designated as the "income" specified in the 16th Amendment subject to income taxation. "Income" in both its generic and technical sense connotes some gain.

Therefore, income tax, pursuant to the 16th Amendment, can be assessed only on "income" and not on "gross receipts." The term gross receipts embodies within it that expenditure of capital that was spent for the product sold. Before there can be income, that expenditure of capital must be recovered. After it has been recovered, then, and only then, is there income which may be subject to taxation under the 16th Amendment.

There seems little doubt that this is the proper construction of the 16th Amendment. Congress itself apparently recognized the limitations placed upon it by the amendment as the revenue laws since 1918 have consistently used "gross income" as the starting point of all income taxation and the courts have interpreted it as meaning just that and not "gross receipts." See Sullenger v. Commissioner, 11 T.C. 1076, 1077; Edenfield v. Commissioner, 19 T.C. 13, 22; Scales v. Commissioner, 18 T.C. 1263, 1276; Commissioner v. Weisman, 1 Cir., 197 F.2d 221, 224. Section 22 of the Internal Revenue Code of 1939, 26 U.S.C. § 22, is indicative of this use of the term "gross income." Congress has not attempted to levy an income tax on gross receipts since the ratification of the 16th Amendment by the states.

Thus, I believe that the true cost of goods sold cannot, under the present state of the Constitution, be subject to

income taxation since items properly falling within that category represent capital and not income, and are constitutionally exempt from taxation. However, merely because an item of expense has been placed in that category by the accountant does not mean that it is rightly there. The courts must determine whether or not the item is truly a cost of the product sold. Such is a question of fact and must be determined with reference to the peculiar facts of the case then under consideration.

In the plaintiffs' cases the product allegedly sold was the services of its employees. If that is so, the cost to plaintiffs of the rendition of those services would represent an expenditure of capital on their part and would have to be recovered before any income tax could be assessed pursuant to the constitutional amendment.

It is well settled that labor costs, as such, may, depending on the nature of the labor, be an element of the cost of goods sold. United Carbon Co. v. Commissioner, 32 B.T.A. 1000, reversed on other grounds, 4 Cir., 1937, 90 F.2d 43; Woodside Acres, Inc. v. Commissioner, 46 B.T.A. 1124, affirmed, 2 Cir., 1934, 134 F.2d 793; Edenfield v. Commissioner, supra. The court in Woodside Acres stated as follows 46 B.T.A. at page 1129:

" * * * Expenditures included in the cost of production of the milk certainly include the cost of feed for the cows and the wages of the men who took care of the animals and milked them. The milk then had to be separated from the cream and had to be pasteurized. The butter had to be churned. The wages of the men who put the product through these processes are properly a part of the cost of production."

The Tax Court has also held that wages in a construction business where the primary product sold is the services of its employees are actually a part of the cost of goods sold, Edenfield v. Commissioner, supra. In that case, it was the Commissioner of Internal Revenue who

argued that the labor of an electrical contracting business was properly an element of the cost of goods sold. The Commissioner's argument was sustained by the decision of the Tax Court with the following language 19 T.C. at page 22:

"Petitioner claims $758,004.18 gross income was reported from his business of Edenfield Electric Co. Of course, if he is correct as to that, then clearly section 275(c) does not have any application. But it seems to us that petitioner confuses gross receipts with gross income and obviously the two are not the same. The expenses in question constitute a part of the cost of operations of the Edenfield Electric Co. and, as such, these expenses are to be deducted from gross receipts in arriving at gross income. The Internal Revenue Code authorizes no deduction for cost of goods sold or cost of operation but such costs must be deducted in arriving at gross income."

In that case the Government stood to gain by the inclusion of the labor in the cost of goods sold because the issue there was whether the taxpayer had omitted on his return 25 percent of his gross income so as to bring into effect the 5-year statute of limitations, thereby lifting the bar of the 3-year statute. The taxpayer claimed that the wages he paid were not part of his cost of goods sold and that only his materials were. With the inclusion of labor as part of the cost of goods sold it reduced taxpayer's gross income to an amount, which when added to other income, made the amount reported less than 25 percent of the true gross income and thereby brought into operation the 5-year statute of limitations against plaintiff. The Government's argument and the Tax Court decision in that case seem to indicate that the Government and the Tax Court recognize that labor costs of the nature in question in the instant suit, that is, labor costs of a construction business where the pri-

mary product sold is services, are truly a part of the cost of goods sold of the business.

While these cases establish that certain wages may be properly included as part of the cost of goods sold and, also, that an item properly includible in the cost of goods sold should be accorded tax treatment consistent with that terminology, they do not involve the question of whether wages paid in excess of ceilings prescribed pursuant to statute can be excluded therefrom by the Commissioner of Internal Revenue when that statute gives the President the authority to certify to the various governmental departments the extent to which that department should disallow the amount of the overpayment in determining the costs and expenses of the violator. However, it seems quite clear, based on what I have said above, that if the wages in question are truly an element of the cost of goods sold they cannot be excluded therefrom by the Commissioner of Internal Revenue despite the Stabilization Act; indeed, even the Congress cannot exclude them from the cost of goods sold if they are truly an element thereof. Moreover, any revenue act that attempts to reach the actual cost of goods sold and deny its inclusion in arriving at gross income is unconstitutional. The Constitution is supreme and all else subordinate thereto. However, I do not think the Defense Production Act of 1950 is unconstitutional. I simply say that a construction cannot be placed upon that act that would attempt to tax a constitutionally exempt item. Section 401 of the 1950 act states that "all agencies dealing with the subject matter of this title, *within the limits of their authority and jurisdiction,* shall cooperate in carrying out these purposes." Thus, it can be seen that Congress had no intention of attempting to give the Commissioner of Internal Revenue a power he did not otherwise have. The act specifically said he could act only within the limits of his authority, and his authority was limited by the Constitution which allows him to assess income tax on income only, not on capital.

It is my opinion that *all* the wages paid by plaintiffs to those employees charged with the duty of doing the plastering work are truly part of the partnership's cost of goods sold and on no theory can such labor be excluded from the cost of goods sold. They are constitutionally exempt from taxation. To tax them would be to levy an income tax on capital and not on income.

Further, it is my opinion that the excessive wage payments of $13,535 here in question are also truly part of the cost of goods sold; hence, the Commissioner of Internal Revenue does not have the authority to exclude them from those costs in arriving at taxable income notwithstanding the Defense Production Act. This is not to say that in a situation involving wages which are not a part of the cost of goods sold but otherwise deductible as ordinary and necessary business expenses under section 23 of the 1939 Internal Revenue Code the Commissioner would not have the power to exclude excessive payments as deductions in arriving at taxable income when he received a Certificate of Disallowance. He would clearly have the authority to do so in such a case as it was given him by section 405(b) of the Defense Production Act.

I feel that there is no element of unconstitutionality in section 405(b) and that "costs and expenses" therein used and "deductions" used in the Economic Stabilization Agency General Order No. 15 relate, insofar as the Internal Revenue Code is concerned, only to those items properly deductible or excludible under the code. Since such deductions or exclusions are matters of legislative grace, they can be taken away by Congress as well.

I think it would be appropriate to note that my views here do not tend in any way to defeat the purpose of the act which was, *inter alia,* to prevent inflation by holding wages to certain prescribed maximums, nor do they tend to put the

Government in the position "of subsidizing the violation of its law or public policy," as the majority suggests, since sections 409 and 706 of the act provide civil and criminal penalties which are sufficiently adequate to insure substantial compliance. Among other things, those sections make a violator of the law subject to a $10,000 fine and imprisonment for one year. Also, I do not feel that a decision as suggested by this opinion would frustrate any law or public policy as the majority believes it would. It seems to me that the Constitution, the basic law of the land, is the framework for all public policy. The Congress apparently has the power to regulate wages but in so doing it cannot reduce or cut across the announced policy of the Constitution as it relates to income taxation, that is, that only income, not capital, is subject to income taxation.

I think the plaintiffs are entitled to a judgment for the entire amount claimed, plus interest as provided by law.

LITTLETON, Judge, joins in the foregoing dissent.