**McCULLEY v. KELM.**
Civ. 3597.

United States District Court
D. Minnesota, Fourth Division
May 21, 1953.

In this action plaintiff seeks to recover, with interest, $3,405.92, representing additional income taxes, penalties and interest paid to the Collector of Internal Revenue for the year 1944.

Matthew J. Levitt and Sidney J. Kaplan, of Minneapolis, Minn., for the plaintiff.

Paul S. McMahon, Special Asst. to the Atty. Gen., and Philip Neville, U. S. Atty., and Ronald E. Hachey, Asst. U. S. Atty., both of St. Paul, Minn., for the defendant.

NORDBYE, Chief Judge.

Plaintiff taxpayer reported on the cash basis and filed Form 1040–F, "Schedule of Farm Income and Expenses", with his tax return for 1944 on March 15, 1945. Under the heading "Farm Income for the Taxable Period", the taxpayer entered the following items:

| | | |
|---|---:|---:|
| "Sale of Produce Raised | | |
| Popcorn | $ 180.50 | |
| "Other Farm Income | | |
| Pasture rental returns | $ 50.00 | |
| Feed sales commission | 160.20 | 210.20 |
| | | |
| "Sale of Livestock and | | |
| Other Items Purchased | | |
| Gross sales price of 10,000 turkeys | $60,521.46 | |
| Less: Cost or other basis [Original cost of turkey poults] | 9,500.00 | 51,021.46 |
| | | |
| "Gross Profits | | $51,412.16" |

The taxpayer listed $47,719.84 worth of deductions which were subtracted from gross profits to arrive at his net profit. The cost of turkey feed, labor and other items necessarily expended to raise the turkeys constituted the greatest part of the taxpayer's expense deductions.

On March 16, 1948, the Bureau of Internal Revenue started an examination of plaintiff's tax liabilities for various years, including 1944. This examination showed that the taxpayer had understated his gross income for 1944 by $7,136.80 and a deficiency was assessed against him. The total amount of the assessment, penalty and interest was paid by the taxpayer to the Collector on April 13, 1950. Consent was not given to extend the period of permissive assessment; on June 7, 1950, the taxpayer filed a claim for refund on the theory that the examination and assessment were untimely and barred by the three-year statute of limitations in section 275(a) of the Internal Revenue Code, 26 U.S.C.A. The deficiency assessment was made on the premise that it was within the five-year period of limitations, Int.Rev.Code, § 275(c), because the understatement of gross income was in excess of 25 per cent of the gross income stated in the tax return. The Government computed the taxpayer's gross income from farming by subtracting from the sales price of the turkeys, not only the cost of the turkey poults, but also the cost of turkey feed, labor, and any other items necessarily expended to raise them. This computation resulted in a gross income of

$15,663.51; therefore, the amount omitted ($7,136.80) was more than 25 per cent of the taxpayer's gross income.

The taxpayer does not challenge the adjustments made to reflect his true income for 1944. He disagrees only with the Government's computation of gross income and states that his gross income is to be determined by subtracting only the original cost of the turkey poults from the selling price of the turkeys. Under this method of computation the gross income would be as entered under "Gross Profits" on Form 1040–F and the understatement of $7,136.-80 would be far less than 25 per cent of it.

The only issue for determination is whether the taxpayer's omission from gross income was in excess of 25 per cent of the gross income stated in the tax return for 1944, thereby extending the period of limitations to five years for assessing a deficiency. If the taxpayer's computation of gross income is correct, the three-year statute of limitations for assessing deficiencies, Int.Rev.Code, § 275(a), had run at the time that the Government started its investigation on March 16, 1948. On the other hand, if the Government's method of determining gross income is correct, the five-year statute of limitations is applicable and had not run at the time of the investigation.

The taxpayer contends that his computation is supported by (1) the instructions on page 4 of Form 1040–F; (2) Section 29.22(a)–7 of Treasury Regulation 111; and (3) Section 29.23(a)–11 of Treasury Regulation 111. The Government bases its claim primarily upon Woodside Acres, Inc., v. Com'r of Int. Rev., 2 Cir., 1943, 134 F. 2d 793.

Neither Form 1040 nor 1040–F designate any specific amount as gross income—Form 1040 refers to "Your Income" and "Profit from Business or Profession"; Form 1040–F lists "Gross Sales Price", "Profit", "Profit on Sale of Livestock and Other Items", and "Summary of Income and Deductions Computed on a Cash Receipts and Disbursements Basis." The term "gross income" does not convey the same definite and inflexible significance under all circumstances and wherever used. Its construction and meaning depend upon the context and subject matter. See 38 C.J.S., Gross, p. 1082. In the field of income taxation, the term carries the implication of gains, profits or increment. But because of the many possible constructions it is necessary to determine the particular meaning of "gross income" as applied to the instant farmer taxpayer.

Paradoxically, the only authority cited by the Government for its position, Woodside Acres, Inc. v. Com'r of Int. Rev., by its dicta, at least, seems to favor the taxpayer's computation of gross income. In that case, the issue was whether the taxpayer was required to file a return and pay taxes as a personal holding company under section 501 of the Internal Revenue Code. The decision on this issue depended on how the gross income from the dairy farm was determined—if less than 20 per cent of the taxpayer's gross income was derived from farming he was required to file as a personal holding company. Gross income was computed by the taxpayer by deducting only two items (cost of milk and cream purchased for resale, cost of seeds and plants) from gross receipts. The Government's position was that the cost of feed bought and used in the dairy farm and the cost of dairy labor should also be deducted from gross receipts to arrive at gross income. The taxpayer argued that the provisions of Article 22(a)–7 and 23(a)–11 of Treasury Regulation 94 (substantially the same as Sections 29.22(a)–7 and 29.23(a)–11 of Regulation 111) dealing with farmers' gross income and expenses, were to be followed in determining gross income under the personal holding company taxing statute. This reasoning was rejected and the court held that the cost of dairy feed would be subtracted from gross receipts in order to arrive at the gross income of a taxpayer from a farm under the personal holding company taxing act. The court stated at page 795 of 134 F.2d,

"* * * Congress made no mention of any regulations. We are unwilling, therefore, to impute to it an intent to adopt apparently inapplicable regulations which define gross income for one purpose [farmers] to provide

the definition of gross income for the entirely new and different purpose of the personal holding company taxing statute. It follows then as a matter of course that this taxpayer was permitted to report as a part of its gross income in its return no more of its gross receipts than it could have so reported had it been engaged in some business other than farming."

The question of dairy labor was not dealt with because if the cost of dairy feed was subtracted, the taxpayer had to file as a personal holding company anyway.

The Woodside Acres case did not prescribe how the gross income of a farmer was to be determined; but, rather, how the gross income of a taxpayer from a farm was to be determined *under the personal holding company taxing statute*. In commenting upon the non-applicability of farmers' gross income regulations to a personal holding company, the court recognized that the costs of production were not subtracted from gross receipts in computing the gross income of a farmer. At page 794 of 134 F.2d the court stated,

"* * * Thus far it seems that the language of the statute and these regulations support the petitioner in its contention that as a farmer its gross income must be treated at least as so much of its gross receipts as would remain before subtracting the expenses it is allowed to deduct from what is called its gross income. *It is certainly correct if it is permitted to deduct those expenses after its gross income has been computed for it cannot deduct them both in computing gross income and from gross income."* [Emphasis supplied.]

The Woodside holding was followed in Garrett Holding Co. v. Com'r, 1947, 9 T.C. 1029, which arose on similar facts. The Garrett case also recognized, by dictum, that costs of production would not be subtracted from a farmer's gross receipts in computing his gross income. The court stated at page 1034, of 9 T.C.

"The petitioner contends that in determining its gross income under section 501(a)(1) the costs of its farm production should not be subtracted from its gross receipts; in short, that gross income means gross receipts. *Such procedure appears to be followed in reporting the gross income of farmers for income tax purposes, whether on a cash or accrual basis. See section 29.22(a)-7 of Regulations 111.* The petitioner argues that the same procedure should be applied in determining the gross income of farmers for personal holding purposes. Its argument was fully discussed and rejected in Woodside Acres, Inc., v. C. I. R., 46 B.T.A. 1124; affirmed [2 Cir.], 134 F.2d 793. There we deducted the costs of production from the gross sales of dairy products in determining gross income for personal holding company purposes. * * * The petitioner next contends that we should distinguish that case [Woodside Acres] because there the taxpayer was on an accrual basis (though no inventories were used), while here the petitioner was on a cash basis. It argues that the regulations, supra, make a distinction between the cash and accrual methods of reporting income. In the absence of inventories, we think that is a distinction without difference. *Moreover, under the regulations the gross income of farmers is to be determined for income tax purposes on the basis of gross receipts in either case."* [Emphasis supplied].

The Woodside-Garrett holdings were limited to taxpayers under the personal holding company taxing statute; no attempt was made to construe section 275(c) of the Internal Revenue Code. The dicta regarding a farmer's gross income support the taxpayer, rather than the Government, in the instant case.

The instructions on page 4 of Form 1040-F and the regulations also indicate that expense deductions are to be subtracted after gross income is computed. The instructions speak of deducting necessary expenses *from* gross income; Section 29.22 (a)-7 directs that the profit from livestock or other items purchased which is to be

836

included in gross income is to be ascertained by deducting the *cost* from the sales price; Section 29.23(a)–11 allows the deduction *from* gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. It is not possible to subtract expense deductions both in the computation of gross income and from gross income.

It is evident from a study of the Form 1040–F instructions, applicable regulations and the dicta in the Woodside-Garrett cases that a farmer's costs of production are not to be subtracted from gross receipts in order to determine gross income, at least so far as a farmer's tax return is concerned. On the cash basis, the gross income from farming, designated as "gross profits" on Form 1040–F, is the total of: (1) selling price of livestock and produce raised; (2) the profit (excess of selling price over cost) on livestock and other items purchased; and (3) other farm income itemized in column 3 of page 1 of Form 1040–F. It is this gross income, plus any income from sources other than farming, that is determinative of whether a farmer must file a return. The net profit of farm operations, after considering all farm expenses, and after being determined on page 1 of Form 1040–F, is then carried over to the regular Form 1040 and is added to the other items of gross income; this total constitutes "adjusted gross income". The amount of adjusted gross income determines whether the farmer may elect to file a Short-Form 1040, by means of which his personal or non-business deductions are automatically determined, or whether those deductions may be taken as the "optional standard deduction" allowed on Long-Form 1040 in lieu of listing them separately on Long-Form 1040.

■ However, the Government seems to argue that section 275(c) means something different when it uses the term "gross income." The provisions of section 275(c) are silent as to the meaning of gross income:

"(c) *Omission from gross income.* If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per

centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed."

The Government has not cited any authority other than the Woodside case in support of its position, nor has counsel's search revealed any other authority in favor of it. It would seem, therefore, that in the case of a farmer the meaning of the term "gross income" as used in section 275(c) should be equated to the meaning of that term as established for his income tax return purposes. That is, when computing a farmer's gross income for purposes of section 275(c) of the Internal Revenue Code, the costs of production are not deducted from gross receipts. No good reason is suggested herein why the Court should not interpret the term "gross income" as used in section 275(c) in the same way as the farmer taxpayer was instructed to determine his gross income in his return for the year in question.

■ The five-year statute of limitations in section 275(c) is inapplicable to the instant case because the understatement of gross income is not in excess of 25 per cent of the gross income stated in the tax return. It follows that the three-year statute of limitations, Int.Rev.Code, § 275(a), applies and had run at the time that the Government started its investigation on March 16, 1948. Since the Government's investigation and assessment was untimely and barred by the statute of limitations, the taxpayer is entitled to recover $3,405.92 (representing additional taxes, penalties and interest paid to the Government) with interest from the date of payment, April 13, 1950.

The above may be considered as the Court's findings of fact, and as conclusions of law that plaintiff have judgment against the defendant for the sum of $3,405.92 with interest thereon according to law from April 13, 1950. Let judgment be entered accordingly.

An exception is reserved.